FILED

2020 Sep-23  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

PFE/AJB/CDM
GJ#: 32 (Oct. 2020)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## <u>NORTHEASTERN DIVISION</u>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | **21 U.S.C. § 846** |
| **MARK MURPHY,** | ) | **21 U.S.C. § 841** |
| **JENNIFER MURPHY,** | ) | **18 U.S.C. § 1349** |
| **BRIAN BOWMAN,** | ) | **18 U.S.C. § 1347** |
| **CHRISTIE ROLLINS,** | ) | **18 U.S.C. § 371** |
| **a/k/a "Christie Schneid,"** | ) | **42 U.S.C. § 1320a-7b(b)** |
| **MARK MURPHY, JR., and** | ) | **26 U.S.C. § 7206(1)** |
| **WILLIE FRANK MURPHY** | ) | **18 U.S.C. § 2** |

### INDICTMENT

The Grand Jury charges that:

#### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

#### THE DEFENDANTS

1.     **MARK MURPHY** resided in Marshall County, Tennessee, and was a pain management physician who was licensed to practice medicine in the States of Alabama and Tennessee and had Drug Enforcement Administration ("DEA") registration numbers that allowed him to write prescriptions for controlled substances.

1

2.     **JENNIFER MURPHY** resided in Marshall County, Tennessee, and was **MARK MURPHY'S** wife.

3.     **MARK MURPHY, JR.,** resided in Marshall County, Tennessee, and was the son of **MARK MURPHY** and **JENNIFER MURPHY**.

4.     **WILLIE FRANK MURPHY** resided in Marshall County, Tennessee, and was the brother of **MARK MURPHY**.

5.     **BRIAN BOWMAN** resided in Etowah County, Alabama, and was a marketer.

6.     **CHRISTIE ROLLINS**, a/k/a "Christie Schneid," resided in Marshall County, Tennessee.

7.     **MARK MURPHY** and **JENNIFER MURPHY** conspired to unlawfully distribute and dispense controlled substances and indeed used controlled substances to grow and maintain a large patient population in order to profit from medically unnecessary services that **MARK MURPHY** would order for those patients. **MARK MURPHY**, **JENNIFER MURPHY**, **BRIAN BOWMAN**, **CHRISTIE ROLLINS**, **MARK MURPHY, JR.,** and **WILLIE FRANK MURPHY** also conspired to and engaged in a scheme to pay and receive kickbacks and to defraud health care benefit programs out of at least $41,000,000 in payments for items and services that were medically unnecessary and, in some cases not provided.  Such items and services included: (1) medical office visits, (2) durable

2

medical equipment ("DME"), (3) urine drug screens ("UDS"), (4) high-reimbursing pharmaceuticals, and (5) nerve conduction studies. Finally, **JENNIFER MURPHY** used a purported charity to conceal receipt of illegal kickbacks and submitted false tax returns to conceal income received from the fraud.

### RELATED PARTIES AND ENTITIES

8.      Northern Alabama Pain Services ("NAPS") was a network of pain clinics located in Decatur, Alabama; Madison, Alabama; and Lewisburg, Tennessee. **MARK MURPHY** primarily operated his medical practice out of NAPS. **JENNIFER MURPHY** served as an office manager of NAPS.

9.      The Crystal Murphy Enrichment Organization was a registered 501(c)(3) charitable organization created by **JENNIFER MURPHY** in the name of her deceased daughter, Crystal Murphy.  Its stated mission was to provide opportunities for deserving and needy families to experience national parks and other benefits, including scholarship aid. **JENNIFER MURPHY** administered the Crystal Murphy Enrichment Organization.

10.     Compass Laboratories ("Compass") was a Tennessee corporation, with its principal place of business in Memphis, Tennessee.  Compass operated as a clinical laboratory and performed urinary drug screens and other lab services for NAPS patients. **BRIAN BOWMAN** was a part-owner of Compass. Compass employed **CHRISTIE ROLLINS**, **MARK MURPHY, JR., WILLIE FRANK**

**MURPHY** and **INDIVIDUAL G** as technicians to collect urine for testing (the "urine collectors").

11.     MedPlus Medical ("MedPlus") was a Tennessee limited liability company, with its principal place of business in Memphis, Tennessee.  MedPlus was a Medicare-enrolled supplier of DME.

12.     OrthoPlus, LLC ("OrthoPlus") was an Alabama limited liability company, with its principal place of business listed as Birmingham, Alabama. **BRIAN BOWMAN** was the sole owner of OrthoPlus.

13.     QBR, LLC ("QBR") was an Alabama limited liability company with its principal place of business in Athens, Alabama.  QBR was in the business of, among other things, conducting nerve conduction velocity tests and evoked potential reflex tests (together, "nerve conduction studies").

14.     Pharmacies 1-12 were all in the retail pharmacy business, including dispensing and billing high-reimbursing and compounded medications.

15.     **INDIVIDUAL G** resided in Marshall County, Tennessee.

<u>**BILLING FOR MEDICAL SERVICES**</u>

16.     Various public and private entities offered health insurance plans to cover medical care, pharmaceuticals, diagnostic tests and other services provided to individuals covered by those plans. Individuals who had health coverage with health insurance plans were often referred to as "beneficiaries" or "members." By way of

example:

    a. Blue Cross Blue Shield of Alabama ("BCBSAL") was a private health insurance company that provided medical and prescription drug insurance coverage in Alabama and elsewhere.

    b. TRICARE was a federal health care program of the United States Department of Defense ("DOD") Military Health System that provided drug insurance coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families and survivors.

    c. The Medicare program was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

17. Medicare, TRICARE, BCBSAL and other similar private and public insurance programs were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b). These plans and others provided health benefits including for office visits, DME, nerve conduction studies, urinary drug screening

and prescription drugs.  Medicare and TRICARE were also "federal health care program[s]," as defined in Title 42, United States Code, Section 1320a-7b(f).

18.     Payments under these health care benefit programs were made directly to a provider of the goods or services, rather than to a beneficiary.  These payments occurred when the provider submitted the claim to the health care benefit program for payment, either directly or through a billing company.

## THE MEDICARE PROGRAM

19.     Medicare was divided into four parts which helped cover specific services: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C) and prescription drug benefits (Part D).  Medicare contractors helped to administer the Medicare program.

20.     Part B of the Medicare program covered the cost of physicians' services, medical equipment and supplies and diagnostic laboratory services. Specifically, Part B covered medically necessary physician office services, DME, UDS and nerve conduction studies.

21.     Medicare Part D provided prescription drug benefits to eligible Medicare beneficiaries.  Part D reimbursed pharmacies directly for part of the cost of prescription and compounded drugs dispensed to qualified Medicare beneficiaries.

22.     Upon signing a certification to Medicare, a medical provider, whether

a clinic, physician, or other health care provider that provided items or services to Medicare beneficiaries, was able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes.  A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor or carrier that included the PIN assigned to that medical provider.

23.     A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services and the name and identification number of the physician or other health care provider who had ordered the services.  When an individual medical provider was associated with a clinic and medically necessary services were provided at that clinic's location, Medicare Part B required that the individual health care provider numbers associated with the clinic be placed on the claim submitted to the Medicare contractor.

24.     By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules and regulations governing reimbursement.  To receive Medicare funds, enrolled providers, together with their authorized agents, employees and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act and applicable policies, procedures, rules and regulations issued by CMS and its authorized agents and contractors.  Health care providers were given and provided

with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

25.     Cahaba GBA ("Cahaba") administered the Medicare Part B program for claims arising in the State of Alabama.  The Centers for Medicare & Medicaid Services ("CMS") contracted with Cahaba to receive, adjudicate, process and pay certain Part B claims, including medical services related to physician office services, DME, nerve conduction testing, as well as services that were provided in connection with a laboratory testing facility, including urine drug testing.

26.     AdvanceMed was the Zone Program Integrity Contractor ("ZPIC") for Medicare Part B in the State of Alabama.

27.     The ZPIC was a contractor that investigated fraud, waste and abuse.  As part of an investigation, the ZPIC could conduct a clinical review of medical records to ensure that payment is made only for services that meet all Medicare coverage and medical necessity requirements.

## DETAILS OF HEALTH INSURANCE PROGRAM REQUIREMENTS

28.     Private insurers like BCBSAL often implemented rules similar or identical to those propagated by Medicare.

29.     For example, health care providers could only submit claims to Medicare, TRICARE and BCBSAL for reasonable and medically necessary services that they rendered. When a health care provider submitted a claim for an item or

service to a health care benefit provider, such claim constituted a statement that the item or service was both reasonable and medically necessary for the beneficiary. Health care benefit providers would not pay for claims that were not reasonable and medically necessary.

30.    Like Medicare, TRICARE and BCBSAL also would not pay claims procured through kickbacks and bribes.

31.    Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician or other health care provider. Medicare required complete and accurate patient medical records so that Medicare could verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare, through Cahaba and other contractors, to review the appropriateness of Medicare payments made to the health care provider.  BCBSAL, TRICARE and other insurers had similar or identical requirements for the proper maintenance of complete and accurate medical records.

## SPECIFIC BILLING RULES AND REQUIREMENTS

### OFFICE VISITS

32.     Medicare Part B, TRICARE and BCBSAL each reimbursed providers for medically reasonable and necessary evaluation and management services, *e.g.*, office visits ("E&M").  Typically, providers billed insurers using one of five codes, numbered 99211 through 99215.  Reimbursement for each code increased depending on the last number, with 99211 paying the lowest and 99215 paying the highest. Health care providers were required to pick the correct code based on the intensity and length of the office visit, as well as the complexity of the patient's condition.  In billing an E&M service, the provider was required to bill a lower-paying code, or enter a supplemental code, known as a "modifier," to alert the health care benefit program if he or she was not personally performing the service.

### DURABLE MEDICAL EQUIPMENT

33.     Medicare covered an individual's access to durable medical equipment or DME, such as off-the-shelf ("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces and hand braces (collectively, "braces"). OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

34.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or

injury and prescribed by a licensed physician.

35.    For certain DME products, Medicare promulgated additional requirements that a DME order must meet for an order to be considered "reasonable and necessary." For example, for off-the-shelf knee braces billed to Medicare under the Healthcare Common Procedures Coding System ("HCPCS") Codes L1833 and L1851, an order would be deemed "not reasonable and necessary" and reimbursement would be denied unless the ordering/referring physician documented the beneficiary's knee instability using an objective description of joint laxity determined through a physical examination of the beneficiary.

36.    There were 30 "Supplier Standards" laid out for a DME company that planned to bill Medicare that were listed in Title 42, Code of Federal Regulations, Section 424.57(c).  All Medicare Suppliers were required to be familiar with and abide by these Supplier Standards.  In addition, the Supplier Standards were required to be disclosed to any Medicare beneficiary served by a Medicare Supplier.  Supplier Standard 18 stated that Medicare Suppliers may not "convey or reassign a supplier number."  In addition, Supplier Standard 29 prohibited a Medicare Supplier from "sharing a practice location with any other Medicare supplier or provider."

## URINARY DRUG SCREENING

37.    UDS were used to measure the presence of substances in a patient's urine and were often used in connection with the prescription of controlled

substances. UDSs could be "qualitative" and used to determine the presence or absence of substances, or the screenings could be "quantitative" and used to provide a numerical concentration of a substance.

38.    Medicare, TRICARE and BCBSAL and other health care benefit programs limited the allowed purposes of quantitative screenings.  One such accepted purpose would be if a patient tested negative for a prescribed medication during a qualitative screening, but the patient insisted s/he was taking the medication.  A laboratory may then perform a quantitative screening to evaluate or confirm the findings of the qualitative testing.  The same was true if a patient tested positive for a non-prescribed medication or drug during qualitative testing which s/he insisted had not been used.  However, according to insurance and Medicare rules and regulations, regular, routine, or recreational drug screenings, were not reasonable or medically necessary.  Further, the health care benefit programs required that a patient's medical record must include documentation that fully supported the reasonableness of and medical necessity for the UDS.

## PRESCRIPTION DRUGS

39.    When billing for prescription drugs dispensed, a pharmacy typically billed a health insurance plan through third-party administrators.

      a. A Pharmacy Benefit Manager ("PBM") was a third-party administrator of prescription drug programs, including privately

or government insured drug plans and acts on behalf of one or more prescription drug plans, such as BCBSAL.

b. A Pharmacy Services Administrative Organization ("PSAO") was also a third-party administrator. Pharmacies may contract with PSAOs, which in turn contracted with PBMs, such that PSAO member pharmacies may participate in a PBM network.

c. A pharmacy could participate in a health insurance plan by joining a PBM's pharmacy network through an agreement with a PBM or a PSAO. If a pharmacy joined a PBM network through an agreement with a PSAO, it agreed to be bound by the terms of the agreement between the PSAO and the PBM.

40. Prime Therapeutics ("Prime"), Express Scripts Incorporated ("ESI") and others were PBMs for various health insurance plans. Prime was a PBM for BCBSAL and other insurance plans; ESI was a PBM for TRICARE and other insurance plans. Prime, ESI and other PBMs were "health care benefit program[s]," as defined in Title 18, United States Code, Section 24(b), and "federal health care program[s]," as defined in Title 42, United States Code, Section 1320a-7b(f). By contracting with PBMs, directly or indirectly, providers agreed to comply with all applicable laws, rules and regulations, including all applicable Federal and State anti-kickback laws.

41. When billing for prescription drugs dispensed, a pharmacy typically billed a health care benefit provider through third-party administrators, which required the that the pharmacy agreed to be bound by and comply with, all applicable State and Federal laws, including those addressing fraud, waste and abuse. A

13

pharmacy also agreed to be bound by the third-party administrator's rules and regulations, along with the rules and regulations of the health care benefit provider. These rules included prohibitions against fraudulent conduct, including paying illegal remuneration to medical providers to prescribe drugs and submitting claims for invalid prescriptions.

42.     Health care benefit providers and their third-party administrators required pharmacies to collect co-pays, typically a fixed amount, from patients, in part so that the patient was financially motivated to decline medically unnecessary or otherwise fraudulent prescriptions.

43.     Health care benefit programs often covered compounded medications. In general, "compounding" was a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combined, mixed, or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient. Compounded drugs were not approved by the U.S. Food and Drug Administration ("FDA"); that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.   The Alabama State Board of Pharmacy regulated the practice of compounding in the State of Alabama.

44.     As an exception to the FDA approval requirement, compounded drugs could be prescribed by a physician when an FDA-approved drug did not meet the

health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug could be prepared excluding the substance that triggered an allergic reaction.  Compounded drugs could also be prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or child who could not swallow an FDA-approved pill and needed the drug in liquid form that was not otherwise available.

### NERVE CONDUCTION STUDIES

45.    Nerve conduction studies were used to determine if a particular nerve was functioning properly by stimulating specific nerves and recording their ability to transmit the impulse. Medicare Part B would cover medically reasonable and necessary nerve conduction studies up to twice a year for the same part of the body. Medicare Part B and other insurers typically did not reimburse for nerve conduction studies routinely performed on a single patient without individualized need or on an entire patient population regardless of need.

### CONTROLLED SUBSTANCES

46.    The Controlled Substances Act ("CSA") governed the manufacture, distribution and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any

person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

47.     Health care providers, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the DEA assigned a unique registration number to each qualifying health care provider including physicians and nurse practitioners.

48.     The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five Schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use and accepted safety for use under medical supervision.

49.     Pursuant to the CSA and its implementing regulations:

a.  Fentanyl was classified as a Schedule II controlled substance and was a very potent opioid medication.  Fentanyl was not recommended to people who had not previously taken opioid pain medication.

16

b. Hydrocodone was classified as a Schedule II controlled substance after October 2014, before which time it was classified as a Schedule III controlled substance. It was an opioid pain medication.

c. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was sold generically and under a variety of brand names, including OxyContin®, Roxicodone®, Endocet® and Percocet. Oxycodone, an opioid pain medication, was about fifty percent stronger than Morphine.

d. Hydrocodone and Oxycodone were among the Schedule II opioid controlled substances that had the highest potential for abuse and associated risk of fatal overdose.

50.   Pursuant to the CSA and its implementing regulations:

a. Alprazolam, a benzodiazepine, was classified as a Schedule IV controlled substance. Alprazolam, sometimes prescribed under brand name Xanax, was a medication used to treat anxiety.

b. Clonazepam, a benzodiazepine, was classified as a Schedule IV controlled substance. Clonazepam, sometimes prescribed under brand name Klonopin, was a medication used to treat anxiety and seizures.

c. Carisoprodol was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14(c). Carisoprodol, sometimes prescribed under brand name Soma, was a muscle relaxant.

51.     Chapter 21 of the Code of Federal Regulations, Section 1306.04, governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

52.     Health care benefit programs would not pay for controlled substances that were dispensed or distributed by way of an unlawful prescription.

53.     Chapter 21 of the Code of Federal Regulations, Section 1306.04, further directed that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

54.     It was well known that the combination of high-dose opioids and benzodiazepines (*e.g.*, Alprazolam) in any dose had a significant impact upon the risk of patient intoxication and overdose. For a treating physician to prescribe this combination of high-dose opioids and benzodiazepines for a legitimate medical

purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risk(s) to the patient's life.

## COUNT ONE
### [21 U.S.C. § 846]
### MARK MURPHY and
### JENNIFER MURPHY

The Grand Jury charges that:

55.    Paragraphs 1 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

56.    Beginning in approximately January 2012 and continuing to in or around March 2017, more exact dates being unknown to the Grand Jury, in Morgan and Madison Counties, within the Northern District of Alabama and elsewhere, the defendants

### MARK MURPHY and
### JENNIFER MURPHY

did knowingly and intentionally combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally unlawfully distribute and dispense and cause to be distributed and dispensed, mixtures and substances containing a detectable amount of Schedule II controlled substances, including Fentanyl, Oxycodone, Hydrocodone, Alprazolam, Clonazepam and Carisoprodol, through prescriptions that were not issued for a

legitimate medical purpose by a practitioner acting in the usual course of professional practice.

All in violation of Title 21, United States Code, Section 846.

## COUNTS TWO THROUGH FOUR
[21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) & 18 U.S.C. § 2]
### MARK MURPHY

The Grand Jury charges that:

57.   Paragraphs 1 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

58.   On or about the dates listed below, within Morgan and Madison Counties, within the Northern District of Alabama and elsewhere, the defendant

### MARK MURPHY

did knowingly, intentionally, and unlawfully distribute and dispense, and cause to be distributed and dispensed, mixtures and substances containing a detectable amount of Schedule II controlled substances, including Fentanyl, Oxycodone and Morphine Sulphate, through prescriptions that were not issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.

| Count | Date Prescription Issued | Patient | Substance |
|:-----:|:------------------------:|:-------:|:---------:|
| 2 | January 26, 2016 | C.P. | Morphine Sulfate IR 30 mg tab |
| 3 | January 4, 2016 | M.A. | Oxycodone HCL 30 mg |
| 4 | January 27, 2016 | C.H. | Fentanyl 25 mcg/hr patch |

All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2.

## COUNT FIVE
[18 U.S.C. § 1349]
**MARK MURPHY,**
**JENNIFER MURPHY,**
**BRIAN BOWMAN and**
**CHRISTIE ROLLINS**

The Grand Jury charges that:

59.     Paragraphs 1 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

60.     From approximately June 2012 and continuing until at least in or around March 2017, the exact dates being unknown, within Morgan and Madison Counties in the Northern District of Alabama and elsewhere, the defendants

**MARK MURPHY,**
**JENNIFER MURPHY,**
**BRIAN BOWMAN and**
**CHRISTIE ROLLINS**

did knowingly and willfully conspire, combine, confederate and agree with each other and others known and unknown to the Grand Jury to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, TRICARE, BCBSAL, Prime Therapeutics and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by,

21

and under the custody and control of, said health care benefit programs, in connection with the delivery of  and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

61.    It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, BCBSAL and others for claims for items and services that were: (i) medically unnecessary, (ii) not eligible for reimbursement, (iii) not provided as represented, and (iv) based on kickbacks and bribes; (v) concealing the submission of false and fraudulent claims to Medicare, TRICARE, BCBSAL and others and the receipt and transfer of the proceeds from the fraud; and (vi) diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## Manner and Means

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

62.    **MARK MURPHY** was a member of BCBSAL's Preferred Medical Doctor ("PMD") program and enrolled in Medicare and TRICARE, among other insurers.  In doing so, he agreed only to bill for medically reasonable and necessary

22

services and services that were actually rendered.  Despite these promises, **MARK MURPHY**, with the assistance of **JENNIFER MURPHY**, **BRIAN BOWMAN**, **CHRISTIE ROLLINS**, **INDIVIDUAL G** and others caused thousands of claims for medically unreasonable and unnecessary services to be billed to Medicare, TRICARE, BCBSAL and other insurers.

63.    **MARK MURPHY** and **JENNIFER MURPHY** caused NAPS to maintain a large number of patients through the prescription of medically unnecessary controlled substances.

64.    **MARK MURPHY** and **JENNIFER MURPHY** caused NAPS to bill for items and services as though **MARK MURPHY** personally saw patients when, in truth and in fact, **MARK MURPHY** often did not see patients, but instead, delegated that responsibility to his nurses and other staff.

65.    **BRIAN BOWMAN** would negotiate with third parties, including pharmacies, nerve conduction study providers, DME suppliers and other healthcare providers and suppliers to directly and indirectly pay **BRIAN BOWMAN** a kickback each time **MARK MURPHY** or the NAPS clinic ordered an item or service provided by one of these third parties.

66.    In turn, **BRIAN BOWMAN** offered and paid, and **MARK MURPHY**, **JENNIFER MURPHY**, **CHRISTIE ROLLINS**, **INDIVIDUAL G** and others solicited and received, kickbacks in the form of direct and indirect remuneration in

exchange for and for the purpose of inducing referrals of these medically unnecessary services from NAPS.

67.     For example, urine collectors would see patients at NAPS before they were seen by any medical professional under the guise of collecting their urine samples.  In reality, the urine collectors would market various types of prescription pain and scar drugs, DME and other services to the patients.  The urine collectors would then complete an order using either a photocopied or stamped signature of **MARK MURPHY** and, at the direction of **BRIAN BOWMAN**, **MARK MURPHY** and **JENNIFER MURPHY**, fax or email that prescription or order to **BRIAN BOWMAN** to be sent to various pharmacies, testing laboratories, Nerve Conduction Study providers, DME suppliers and other providers and suppliers and directly to the providers and suppliers themselves in exchange for kickbacks.

68.      The fraud scheme resulted in fraudulent office visits, DME, UDS, prescription drugs, and nerve conduction studies to be billed to health care benefit providers.

69.     As a result of the conspiracy, **MARK MURPHY**, **JENNIFER MURPHY**, **BRIAN BOWMAN**, **CHRISTIE ROLLINS**, and **INDIVIDUAL G** submitted and caused to be submitted approximately $41,000,000 in false and fraudulent claims to Medicare, TRICARE and  BCBSAL and other insurers, resulting in payments of approximately $16,000,000 for those false and fraudulent

claims.

All in violation of Title 18, United States Code, Sections 1349.

## COUNTS SIX THROUGH TEN
[18 U.S.C. §§ 1347 & 2]
**MARK MURPHY,**
**JENNIFER MURPHY,**
**BRIAN BOWMAN and**
**CHRISTIE ROLLINS**

The Grand Jury charges that:

70.     Paragraphs 1 to 54 of this Indictment are realleged and incorporated as though fully set forth herein.

71.     On or about the dates listed below, within Morgan and Madison Counties, within the Northern District of Alabama and elsewhere, the defendants

**MARK MURPHY,**
**JENNIFER MURPHY,**
**BRIAN BOWMAN and**
**CHRISTIE ROLLINS**

in connection with the delivery of and payment for health care benefits, items and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is Medicare, TRICARE, BCBSAL and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of

25

and payment for health care benefits, items and services.

## Purpose of the Scheme and Artifice

72.     Paragraph 61 of this Indictment is realleged and incorporated as though fully set forth herein as a description of the purpose of the scheme and artifice.

## Manner and Means of the Scheme and Artifice

73.     Paragraphs 62 through 69 of this Indictment are realleged and incorporated as though fully set forth herein as a description of the manner and means of the scheme and artifice.

## Acts in Execution of the Scheme and Artifice

74.     On or about the dates specified as to each count below, in Morgan and Madison Counties, within the Northern District of Alabama and elsewhere, the defendants specified as to each count below submitted, caused to be submitted, and aided and abetted in the submission of the following claims to health care benefit programs:

| Ct. | Beneficiary | Date Claim Submitted | Description of Items Billed | Approximate Amount Billed or Paid | Defendants |
|-----|-------------|----------------------|----------------------------|-----------------------------------|------------|
| 6 | L.T. | 4/13/16 (Medicare) | Lidocaine Ointment | $1,390.13 (Paid) | **MARK MURPHY, JENNIFER MURPHY and BRIAN BOWMAN** |

| Ct. | Beneficiary | Date Claim Submitted | Description of Items Billed | Approximate Amount Billed or Paid | Defendants |
|---|---|---|---|---|---|
| 7 | J.P. | 3/29/16 (BCBSAL) | Brace L1833 | $892.21 (Billed) | **MARK MURPHY, JENNIFER MURPHY and BRIAN BOWMAN** |
| 8 | R.H. | 3/11/16 (Medicare) | Brace L0650 | $1,611.16 (Billed) | **MARK MURPHY, JENNIFER MURPHY, BRIAN BOWMAN and CHRISTIE ROLLINS** |
| 9 | M.G. | 11/10/15 (Prime) | Tetramex SPR 2-1-3% | $1,617.35 (Paid) | **MARK MURPHY, JENNIFER MURPHY and BRIAN BOWMAN** |
| 10 | T.H. | 3/18/16 (Medicare) | Brace L0650 | $1,611.16 (Billed) | **MARK MURPHY, JENNIFER MURPHY and BRIAN BOWMAN,** |

All in violation of Title 18, United States Code, Sections 1347 and 2.

**COUNT ELEVEN**
[18 U.S.C. § 371]
**MARK MURPHY,**
**JENNIFER MURPHY,**
**BRIAN BOWMAN,**
**CHRISTIE ROLLINS,**
**MARK MURPHY, JR., and**
**WILLIE FRANK MURPHY**

75.     The allegations in Paragraphs 1 through 54 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

76.     From at least in or around January 2012 and continuing through in or around March 2017, in the Northern District of Alabama and elsewhere, the defendants, **BRIAN BOWMAN**, **MARK MURPHY**, **JENNIFER MURPHY**, **CHRISTIE ROLLINS**, **MARK MURPHY, JR.,** and **WILLIE FRANK MURPHY,** did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury:

   a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program and the United States Department of Defense in its administration and oversight of TRICARE, in violation of Title 18, United States Code, Section 371;

28

b. to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to: (A) any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under Federal health care programs, that is, Medicare and TRICARE; and (B) purchase, lease, order and arrange for and recommend purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care program, that is, Medicare and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(2); and

c. to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (A) referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under Federal health care programs, that is Medicare and TRICARE; and (B) purchasing, leasing, ordering and arranging for and recommending purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, that is,

29

Medicare and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(1).

## Purpose of the Conspiracy

77.    It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich and benefit themselves by:  (1) offering, paying, soliciting and receiving kickbacks and bribes to ensure that orders for DME, nerve conduction studies, UDS, and prescription drugs for Medicare and TRICARE beneficiaries would be referred to various entities, including NAPS, MedPlus, QBR, Pharmacies 1-12 and Compass; (2) submitting and causing to be submitted claims to Medicare and TRICARE for these items and services based on these referrals; (3) concealing the payment, receipt and transfer of illegal kickbacks and the proceeds of the fraud; and (4) diverting proceeds of the scheme for their personal use and benefit and the use and benefit of others.

## Manner and Means

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

78.    **BRIAN BOWMAN** directly and indirectly solicited and received kickbacks from various medical providers, which he, in turn, passed on directly and indirectly to **MARK MURPHY, JENNIFER MURPHY** and the urine collectors,

30

including **CHRISTIE ROLLINS**, in exchange for and to induce the referral of the various medical products and services set forth above.

79.     By way of example, **BRIAN BOWMAN**, using both personal funds and funds from Compass and OrthoPlus, paid and arranged for illegal kickbacks to **MARK MURPHY** and **JENNIFER MURPHY** in a number of forms, with the intent to generate referrals for medically unnecessary tests, services and items, including but not limited to:

    a. **BRIAN BOWMAN** directed Compass urine collectors, including **CHRISTIE ROLLINS**, **WILLIE FRANK MURPHY**, **MARK MURPHY, JR.,** and **INDIVIDUAL G** to perform free services for NAPS in violation of their Compass employment agreements;

    b. **BRIAN BOWMAN** hired **MARK MURPHY's** brother, **WILLIE FRANK MURPHY**, and **MARK MURPHY's** son, **MARK MURPHY, JR.**, as urine techs for Compass, despite their lack of relevant experience in the area, and paid them a Compass salary and other kickbacks;

    c. **BRIAN BOWMAN** made large donations in cash and checks to the Crystal Murphy Enrichment Organization at the direction of **JENNIFER MURPHY** in order to conceal the nature and purpose of the payments;

    d. **BRIAN BOWMAN** arranged for **MARK MURPHY** to receive kickbacks for ordering medically unnecessary nerve conduction studies from QBR and others; and

    e. **BRIAN BOWMAN** provided other monetary and non-monetary benefits to **MARK MURPHY**, **JENNIFER MURPHY**, **WILLIE FRANK MURPHY**, **CHRISTIE ROLLINS**, **MARK MURPHY, JR.,** and **INDIVIDUAL G**, each of whom solicited and received the same.

80.     **MARK MURPHY** and **JENNIFER MURPHY** personally received, directly and indirectly, at least $1,000,000 in kickbacks and benefits as a result of the conspiracy.

81.     **BRIAN BOWMAN** personally received approximately $14,000,000 in kickbacks funneled through OrthoPlus from various third-party entities.

82.     **CHRISTIE ROLLINS** personally received at least approximately $264,071 in kickbacks and other benefits as a result of the conspiracy.

83.     **MARK MURPHY, JR.,** personally received at least approximately $64,096 in kickbacks and other benefits as a result of the conspiracy.

84.     **WILLIE FRANK MURPHY** personally received at least approximately $113,437 in kickbacks and other benefits as a result of the conspiracy.

## Overt Acts

85.    In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Alabama and elsewhere, at least one of the following overt acts, among others:

a.   On or about December 16, 2014, **BRIAN BOWMAN** issued a check to the Crystal Murphy Enrichment Organization from the OrthoPlus account ending in 6204 in the approximate amount of $10,000.   The check was deposited into the Crystal Murphy Enrichment Organization bank account on December 22, 2014.

b.   On or about April 9, 2015, **CHRISTIE ROLLINS** faxed **BRIAN BOWMAN** order forms dated April 13, 2015 for patients of **MARK MURPHY** to receive various prescription creams.

c.   On or about November 2, 2015, **BRIAN BOWMAN** accepted check number 3493 from the Bank Independent account ending in 2948 from Pharmacy 7 in the approximate amount of $13,124.39.

d.   On or about November 9, 2015, **INDIVIDUAL G** caused to be deposited check number 1090 from the OrthoPlus Regions Bank account ending in 6204 in the approximate amount of $1,121.25.

e.   On or about November 10, 2015, **CHRISTIE ROLLINS** caused to

be deposited check number 1096 from the OrthoPlus Regions Bank account ending in 6204 in the approximate amount of $333.33.

f.   On or about November 10, 2015, **WILLIE FRANK MURPHY** caused to be deposited check number 1088 from the OrthoPlus Regions Bank account ending in 6204 in the approximate amount of $1,086.66.

g.   On or about December 2, 2015, **MARK MURPHY, JR.,** caused to be deposited check number 1092 from the OrthoPlus Regions Bank account ending in 6204 in the amount of $896.25.

h.   On or about May 18, 2016, **BRIAN BOWMAN** accepted check number 1587 from the Bryant Bank account ending in 6228 from QBR, LLC in the approximate amount of $26,235.

All in violation of Title 18, United States Code, Sections 371.

### COUNTS TWELVE THROUGH SIXTEEN
[42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2]
**BRIAN BOWMAN**

86.   The allegations in Paragraphs 1 through 54 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

87.   On or about the dates set forth below, with respect to each count, in the Northern District of Alabama and elsewhere, the defendant, **BRIAN BOWMAN,** did knowingly and willfully offer and pay remuneration, that is, kickbacks and

34

bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under Federal health care programs, that is, Medicare and TRICARE; and to purchase, lease, order and arrange for and recommend purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, that is, Medicare and TRICARE, as set forth below:

| COUNT | APPROX. DATE OF PAYMENT | APPROX. AMOUNT | DESCRIPTION |
|---|---|---|---|
| 12 | November 9, 2015 | $1,121.25 | Check No. 1090 from the OrthoPlus bank account ending in 6204 made payable to **INDIVIDUAL G** |
| 13 | November 10, 2015 | $333.33 | Check No. 1096 from the OrthoPlus bank account ending in 6204 made payable to **CHRISTIE ROLLINS** |
| 14 | November 10, 2015 | $1,086.66 | Check No. 1088 from the OrthoPlus bank account ending in 6204 made payable to **WILLIE FRANK MURPHY** |
| 15 | December 2, 2015 | $896.25 | Check No. 1092 from the OrthoPlus bank account ending in 6204 made payable to **MARK MURPHY, JR.** |
| 16 | June 6, 2016 | $14,000.00 | Check No. 2690 from QBR, LLC bank account ending in 6228 made payable to **MARK MURPHY** |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2), and

35

Title 18, United States Code, Section 2.

## COUNTS SEVENTEEN THROUGH TWENTY-TWO
[42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2]
**MARK MURPHY,**
**JENNIFER MURPHY,**
**BRIAN BOWMAN,**
**CHRISTIE ROLLINS,**
**MARK MURPHY, JR. and**
**WILLIE FRANK MURPHY**

88.     The allegations in Paragraphs 1through 54 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

89.     On or about the dates set forth below, with respect to each count, in the Northern District of Alabama and elsewhere, **MARK MURPHY, JENNIFER MURPHY, BRIAN BOWMAN, CHRISTIE ROLLINS, MARK MURPHY, JR., and WILLIE FRANK MURPHY,** did knowingly and willfully solicit and receive remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under Federal health care programs, that is, Medicare and TRICARE; and in return for purchasing, leasing, ordering and arranging for and recommending purchasing, leasing and ordering any good, facility, service and item for which payment can be made in whole and in part under Federal health care programs, that

is, Medicare and TRICARE, as set forth below:

| COUNT | DEFENDANT | APPROX. DATE OF PAYMENT | APPROX. AMOUNT | DESCRIPTION |
|---|---|---|---|---|
| 17 | **BRIAN BOWMAN** | November 2, 2015 | $13,124.39 | Check No. 3493 from Pharmacy 7 bank account ending in 2948 made payable to OrthoPlus, LLC |
| 18 | **CHRISTIE ROLLINS** | November 10, 2015 | $333.33 | Check No. 1096 from the OrthoPlus bank account ending in 6204 made payable to **CHRISTIE ROLLINS** |
| 19 | **WILLIE FRANK MURPHY** | November 10, 2015 | $1,086.66 | Check No. 1088 from the OrthoPlus bank account ending in 6204 made payable to **WILLIE FRANK MURPHY** |
| 20 | **MARK MURPHY, JR.** | December 2, 2015 | $896.25 | Check No. 1092 from the OrthoPlus bank account ending in 6204 made payable to **MARK MURPHY, JR.** |
| 21 | **BRIAN BOWMAN** | May 18, 2016 | $26,235.00 | Check No. 1587 from QBR, LLC bank account ending in 6228 made payable to OrthoPlus, LLC |
| 22 | **MARK MURPHY** and **JENNIFER MURPHY** | June 6, 2016 | $14,000.00 | Check No. 2690 from QBR, LLC bank account ending in 6228 made payable to **MARK MURPHY** |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1), and

Title 18, United States Code, Section 2.

## COUNTS TWENTY-THREE THROUGH TWENTY-FIVE
### [26 U.S.C. § 7206(1) & 18 U.S.C. § 2]
### JENNIFER MURPHY

90.    The allegations in Paragraphs 1 through 54 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

91.    On or about the dates set forth below, in Morgan and Madison Counties, within the Northern District of Alabama and elsewhere, the defendant,

### JENNIFER MURPHY

aided and abetted by others, did willfully make and subscribe U.S. Individual Tax Returns for the calendar years listed below, each verified by a written declaration that it was made under the penalties of perjury, and each of which, at the time when made, the defendant did not believe to be true and correct as to every material matter. Those tax returns, which were prepared and signed in the Northern District of Alabama and filed with a proper officer of the United States at the Internal Revenue Service, falsely represented the defendant's distributions, as laid out below:

| Count | Approximate Filing Date | Year | False Item(s) |
|-------|------------------------|------|---------------|
| 23 | November 10, 2014 | 2013 | Partnership Income, Form 1040, Line 17 - $1,288,074 |
| 24 | May 18, 2015 | 2014 | Partnership Income, Form 1040, Line 17 - $1,166,195 |
| 25 | November 14, 2016 | 2015 | Partnership Income, Form 1040, Line 17 - $1,279,114 |

All in violation of Title 26, United States Code, Section 7206(1) and Title 18, United States Code, Section 2.

## FIRST NOTICE OF FORFEITURE

### (21 U.S.C. § 853)

1.      The allegations in COUNT 1 through COUNT 4 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 21, United States Code, Section 853.

2.      Upon conviction of the offenses set forth in COUNT 1 through COUNT 4 of this Indictment, the defendants **MARK MURPHY** and **JENNIFER MURPHY** shall forfeit to the United States of America, pursuant to Title 21, United States Code, Section 853, any property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.  The property to be forfeited includes, but is not limited to, the following:

   a. An amount of $1,058,153.78 worth of equities, annuities and other investment vehicles contained in BB&T Account Number ****-5508 held in the name of Mark Murphy with designated beneficiary, Jennifer Murphy, currently in the government's possession.

   b. Approximately $380,723.35 worth of equities, annuities and other

39

investment vehicles contained in BB&T Account Number ****-2106 held in the name of Jennifer Murphy with designated beneficiary, Mark Murphy, currently in the government's possession.

c.  A forfeiture money judgment of at least $16,000,000 in United States currency, representing the amount of proceeds obtained, controlled and benefitted from as a result of the offenses alleged.

3.  If any of the property described above, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to 21 U.S.C. § 853.

## SECOND NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(7)

1.      The allegations in COUNT 5 through COUNT 22 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2.      Upon conviction of the offenses set forth in COUNT 5 through COUNT 22 of this Indictment, the defendants, **BRIAN BOWMAN, MARK MURPHY, JENNIFER MURPHY, CHRISTIE ROLLINS, WILLIE FRANK MURPHY and MARK MURPHY, JR.,** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3.      The property to be forfeited includes, but is not limited to, the following:

    a.  A forfeiture money judgment of at least $16,000,000 in United States currency, representing the amount of proceeds obtained, controlled and benefitted from as a result of the offenses alleged.

    b.  An amount of $1,058,153.78 worth of equities, annuities and other investment vehicles contained in BB&T Account Number ****-5508 held in the name of Mark Murphy with designated beneficiary, Jennifer

Murphy, currently in the government's possession.

    c.  Approximately $380,723.35 worth of equities, annuities and other investment vehicles contained in BB&T Account Number ****-2106 held in the name of Jennifer Murphy with designated beneficiary, Mark Murphy, currently in the government's possession.

    d.  Real property located at 351 Peninsula Drive, Gadsden, Alabama, held in the names of Brian Bowman and Leanne Bowman.

4.     If any of the property described above, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

A TRUE BILL.


*/s/ Electronic Signature*
FOREPERSON OF THE GRAND JURY


                              DANIEL KAHN
                              Acting Chief, Fraud Section
                              Criminal Division
                              United States Department of Justice


                              */s/ Electronic Signature*
                              ANTHONY J. BURBA
                              Trial Attorney

                              PRIM F. ESCALONA
                              United States Attorney


                              */s/ Electronic Signature*
                              CHINELO DIKÉ-MINOR
                              Assistant United States Attorney