UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | 5:20-cr-291-LSC-SGC-1 |
| | ) | 5:20-cr-291-LSC-SGC-2 |
| MARK MURPHY | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JENNIFER MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This cause comes before the Court on the post-trial motions filed by
Defendants, Dr. Mark Murphy ("Dr. Murphy") and Jennifer Murphy. (Docs. 180,
181, 201 & 202.) For the following reasons, Docs. 180, 181, and 201 are due to be
denied, and Doc. 202 is due to be granted in part and denied in part.

## I.   Background and Procedural History

Dr. Murphy and Jennifer Murphy were indicted for crimes ranging from drug
distribution conspiracy to health care fraud to kickbacks. The charges stemmed from
the Murphys' operation of a pain management clinic in Decatur and Madison,

Alabama. After a nearly two-week trial, on March 1, 2022, a jury found Dr. Murphy guilty on Counts 1, 3, 5, 6-10, 11, and 22 of the Indictment. Jennifer Murphy was found guilty on Counts 1, 5, 6-10, 11, 22, and 23-25 of the Indictment. These counts were Conspiracy to Distribute Controlled Substance, in violation of 21 U.S.C. § 846 (Count 1); Controlled Substance—Sell, Distribute, or Dispense, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) and 18 U.S.C. § 2 (Count 3); Attempt and Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349 (Count 5); five counts of Health Care Fraud, in violation of 18 U.S.C. § 1347 (Counts 6-10); Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371 (Count 11); Acts Involving Federal Health Care Programs-Illegal Renumerations, in violation of 42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2 (Count 22); and three counts of Fraud and False Statements, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2 (Counts 23-25).

On April 19, 2022, Jennifer Murphy filed a Motion for Judgment of Acquittal and Motion for a New Trial (doc. 180), and Dr. Murphy filed a Motion for New Trial (doc. 181). Jennifer Murphy argued that she is entitled to an acquittal because the evidence presented by the Government was insufficient to sustain her convictions, and she argued that she is entitled to a new trial for several reasons: the weight of the evidence does not support the jury's verdict on all counts, the Court erred in denying

her motion for a mistrial based upon the testimony of Government witness Williard Tapscott, the Court erred in instructing the jury as to Count 1, and the cumulative effect of all of the alleged errors. (*See* doc. 180.) Dr Murphy's sole argument in support of his motion for a new trial was that the Court erred in refusing to allow him to present evidence that he provided good medical care to other patients who were not named in the Indictment or part of the Government's case. (*See* doc. 181.) The Government filed an omnibus response in opposition to the defendants' post-trial motions. (Doc. 186).

On June 27, 2022, the Supreme Court issued its decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022) ("*Ruan*"), a case from the Eleventh Circuit in which two physicians operating a pain clinic in Mobile, Alabama, Dr. John Patrick Couch and Dr. Xiulu Ruan, had been convicted of violating the Controlled Substances Act by dispensing Schedule II drugs outside the usual course of professional practice and without a legitimate medical purpose, as well as numerous other crimes. On July 11, 2022, this Court held a telephone conference with the parties to discuss the impact, if any, that the Supreme Court's holding with regard to jury instructions for a 21 U.S.C. § 841 charge had on this case. Shortly thereafter, the defendants sought leave to file supplemental briefing in support of their post-trial motions, in order to argue

3

that *Ruan* constitutes a significant intervening change in law. This Court obliged, and on July 29, 2022, Dr. and Jennifer Murphy each filed a supplemental brief in support of their post-trial motions, and Dr. Murphy also included a motion for a judgment of acquittal. (Docs. 201 & 202.) In their supplemental motions, Dr. and Jennifer Murphy each claimed that *Ruan* requires a new trial on all charges. Each defendant incorporated the other's arguments by reference. The Government filed an omnibus response in opposition on August 12, 2022. (Doc. 204). Dr. and Jennifer Murphy filed a joint reply in support on September 2, 2022. (Doc. 208).

## II.    Standards of Review

Rule 29(c) of the Federal Rules of Criminal Procedure authorizes the Court, on the defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." On a Rule 29(c) motion for judgment of acquittal, the Court "must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005) (cleaned up). A jury's verdict should stand "if there is any reasonable construction of the evidence that would have allowed the jury to find the

defendant guilty beyond a reasonable doubt." *United States v. Hough*, 803 F.3d 1181, 1187 (11th Cir. 2011) (cleaned up).

Rule 33(a) of the Federal Rules of Criminal Procedure authorizes the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." A motion for a new trial is addressed to the sound discretion of the trial court. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).

## III. Discussion

### A. In light of the *Ruan* decisions, Dr. Murphy's conviction on Count 3 for dispensing a controlled substance unlawfully in violation of 21 U.S.C. § 841(a)(1) is due to be vacated

The parties agree that Dr. Murphy's conviction on Count 3—the substantive drug distribution count—should be vacated. This Court agrees. Count 3 charged Dr. Murphy with the crime of issuing a specific controlled substance prescription unlawfully. Consistent with the law in this and multiple other circuits at the time, including *United States v. Ruan*, 966 F.3d 1101, 1165-70 (11th Cir. 2020) (vacated and remanded in *Ruan*, 142 S. Ct. 2370 (2022)) (hereinafter "*Ruan I*"), this Court instructed the jury that it could convict Dr. Murphy of this crime if it found that he (1) dispensed the prescription, (2) knowingly and intentionally, and (3) without a legitimate medical purpose or outside the usual course of professional practice. The

instructions did not expressly require the jury to find that Dr. Murphy knew that the charged prescription was without a legitimate medical purpose or outside the usual course of professional practice.

As noted, after the trial in this case, the Supreme Court held in *Ruan* that the Government must also prove an additional element: "that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." 142 S. Ct. at 2374. However, the Supreme Court declined to apply its new standard to the facts of *Ruan* and remanded to the Eleventh Circuit to consider the issue in the first instance. *Id.* at 2382. On January 5, 2023, the Eleventh Circuit Court of Appeals issued its remand decision in *United States v. Ruan*, 56 F.4th 1291 (11th Cir. Jan. 5, 2023) (hereinafter "*Ruan II*"). On remand, the Eleventh Circuit held that the jury instruction used in the *Ruan* trial was indeed inconsistent with the Supreme Court's guidance, and that the jury was not adequately instructed that it had to find that Dr. Ruan and Dr. Couch acted with knowledge or intent in order to convict them for dispensing controlled substances in violation of the Controlled Substances Act. *Id.* at 1298. The court further found that this error was not harmless beyond a reasonable doubt for the substantive drug charges and thus vacated those convictions. *Id.* However, it concluded that the instructional error was harmless as to the other

convictions in the case. *Id.* at 1299-1302. Accordingly, the Eleventh Circuit vacated the defendants' substantive drug convictions under 21 U.S.C. § 841(a) and remanded for a new trial but affirmed the defendants' convictions on all other counts. *Id.* at 1302.[1]

The instructions that were given in *Ruan I* are substantially similar to those that were given at the trial in this case. While this Court's instructions were the law in the Eleventh Circuit when given, after *Ruan II*, they are not. The *Ruan* cases compel the conclusion that because the jury was not instructed, as to Count 3, that it must find that Dr. Murphy knew or intended that his prescription was unauthorized—that is, without a legitimate medical purpose or outside the usual course of professional practice—the instruction was erroneous. The parties further agree that the error was not harmless, and this Court agrees. *See United States v. Drury*, 396 F.3d 1303, 1314 (11th Cir. 2005) ("Plainly, a jury instruction that omits an element of the charged offense . . . is subject to harmless error analysis."); *Ruan II*, 56 F.4th at 1298 (finding the error not harmless); *United States v. Robinson*, 505 F.3d 1208, 1224-25 (11th Cir. 2007) (noting that a new trial may be appropriate where

---

1    As of the date of the entry of this Memorandum of Opinion and Order, the mandate has not been issued in *Ruan II*, and a petition for rehearing *en banc* has been filed.

a new case conflicts with the jury instructions given at trial). Accordingly, Dr. Murphy's conviction on Count 3 is due to be vacated.

**B.   The Supreme Court's holding in *Ruan* has no bearing on Dr. and Jennifer Murphy's convictions on Count 1 for conspiring to distribute or dispense controlled substances in violation of 21 U.S.C. § 846, and those convictions stand**

Unlike with the substantive drug count (Count 3), *Ruan* provides no basis for vacating Dr. Murphy's or Jennifer Murphy's drug conspiracy convictions on Count 1. To violate 21 U.S.C. § 846 the Government must prove: "(1) there was an agreement between two or more people to commit a crime (in this case, unlawfully dispensing controlled substances in violation of § 841(a)(1)); (2) the defendant knew about the agreement; and (3) the defendant voluntarily joined the agreement." *Ruan II*, 56 F.4th at 1299 (quoting *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015)). Tracking the law, this Court instructed the jury that it could convict a defendant on Count 1 only if it found that: (1) the defendant agreed with one or more others to try to accomplish a shared and unlawful plan to dispense controlled substances without a legitimate medical purpose or outside the usual course of professional practice; (2) the defendant knew the unlawful purpose of the plan and willfully joined in it; and (3) the object of the unlawful plan was to dispense controlled

substances without a legitimate medical purpose or outside the usual course of professional practice. (Trial Transcript Vol. IX at 129.)

The Eleventh Circuit's recent decision on remand in *Ruan II* forecloses any argument that Dr. and Jennifer Murphy's conspiracy convictions should be vacated by virtue of the Supreme Court's holding in *Ruan*. The drug conspiracy jury instructions that were given in *Ruan I* were nearly identical to the instructions given at trial here. The Supreme Court did not address the drug conspiracy jury instructions in *Ruan*, only the substantive drug distribution jury instructions. On remand, the Eleventh Circuit held that the error with regard to the jury instructions for the substantive drug charges was harmless to Dr. Ruan's and Dr. Couch's convictions for conspiring to dispense drugs unlawfully under 21 U.S.C. § 846. *Ruan II*, 56 F.4th at 1299 ("Because a conviction under § 846 requires the jury to find that the defendants knew of the illegal nature of the scheme and agreed to participate in it, the erroneous jury instruction for the substantive charges has a limited impact here. . . . The jury did not need an additional instruction clarifying between subjective and objective good faith for the 'except as authorized' exception, because the conspiracy instructions already required them to find that the defendant acted with subjective knowledge."). In sum, *Ruan II* compels the conclusion that this Court's

9

instructions on Count 1 were and remain legally correct, and the Supreme Court's *Ruan* decision provides no reason to overturn Dr. and Jennifer Murphy's convictions on Count 1.

### C.   Dr. Murphy's argument that he is entitled to a new trial because he was not allowed to offer "good care" evidence

The Court turns to Dr. Murphy's contention that he should receive a new trial because the Court violated his constitutional right to present a complete defense by ruling that he was prohibited from offering testimony about good medical care from patients not named in the Indictment or in the Government's.

At trial, Dr. Murphy asked to call other patients—at least seven—who would testify that he provided good medical care to them in order to rebut the Government's portrayal of his practice as an illegitimate profit center rather than a legitimate medical practice. He sought to offer evidence of "how long they have been a patient, that they were referred by other doctors, that they received beneficial treatment, that the treatment actually in many cases [sic] the opioids were decreased over time, that in some cases Dr. Murphy did recommend that they try back braces or pain creams, that sometimes they tried and they worked and sometimes they tried and they didn't and then he discontinued them . . . ." (Trial Transcript Vol. VII at 14-15.)

The Government objected, and this Court, commenting that an identical issue was addressed by the Eleventh Circuit in *Ruan* (*I*), prohibited Dr. Murphy from offering the testimony, noting as follows:

> Isn't this exactly like the *Ruan* case? Wasn't this an issue that was raised in *Ruan* with the Eleventh Circuit?
>
> . . .
>
> Well, there are specific patients that were charged, specific patients that the government has pointed to as examples. Every one of those you can bring in here. Every one of those you can put on the stand and say, didn't the doctor really see you. Every one of those, if you come up with those, I am one hundred percent behind you. The problem is, showing other patients as good character evidence to show that he acted correctly with regard to those patients, he's not charged with doing this to every single patient. In fact, there were countless witnesses that testified that he was very caring, that he looked at patients, he examined patients, that he tried to figure out what to do with them. He's not charged with doing this to every patient. He's charged with a conspiracy to do this with patients. Some. It may be a lot. And whatever the government has pointed to is fair game.

(*Id.* at 14, 16–17, 19–20.)

Dr. Murphy did call one patient named in the Indictment (Michael A.) and another discussed by the Government's expert witness (David G.) and was permitted to elicit testimony from them about their care. Dr. Murphy also called five patients not mentioned in the Indictment or Government's proof—John A., Margret

D., Gary S., Deborah P., and Charles B.—but, as directed by the Court, did not ask them questions about the quality of Dr. Murphy's care.

*Ruan I* effectively forecloses Dr. Murphy's argument that he should have been allowed to present the evidence.[2] In *Ruan I*, the Eleventh Circuit rejected an identical argument made by Dr. Couch and Dr. Ruan, who had desired to present the testimony of an individual patient who would testify as to the helpful medical care that he received from Dr. Couch. In assessing the claim, the Eleventh Circuit first noted that although the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, that right is subject to reasonable restrictions, such as the evidentiary prohibitions on irrelevant evidence or evidence whose probative value would likely be outweighed by the danger of undue delay, waste of time, or needlessly presenting cumulative evidence. *Ruan I*, 966 F.3d at 1153-55 & n.22. The Eleventh Circuit then recounted its holding in *United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004), which discussed four circumstances in which a district court's exclusion of a criminal defendant's evidence under the evidentiary rules might violate the Constitution. *Id.* at 1154. The

---

2       Although *Ruan I* was vacated and remanded by the Supreme Court, on remand, the Eleventh Circuit held that it was adopting the reasoning from *Ruan I* on all issues except the challenge to the jury instructions used for the substantive drug charges under 21 U.S.C. § 841. *See Ruan II*, 56 F.4th at 1296 n.1.

court reiterated its holding in *Hurn* that in considering whether a defendant's constitutional right to present a complete defense was violated, a court should first determine whether the right was actually violated and if so, then determine whether the error was harmless beyond a reasonable doubt. *Id.* at 1155.

Like Dr. Couch and Dr. Ruan argued in *Ruan I*, Dr. Murphy argues that his proposed "good care" evidence should have been admitted under the first, second, and fourth *Hurn* categories. As in *Ruan I*, all of these claims fail, but the Court will address them out of order, for reasons explained herein.

The second category of *Hurn* evidence is that which, "though not directly bearing on an element of the offense charged, tends to prove collateral matters relating to the defense." *Ruan I*, 966 F.3d at 1156 (citing *Hurn*, 368 F.3d at 1364). As the doctors did in *Ruan I*, Dr. Murphy argues that "good care" evidence would have tended to prove that he was operating a legitimate practice, as a collateral matter. The *Ruan I* court rejected that argument, noting that the *Hurn* court envisioned this category as pertaining to "evidence that tends to negate the *mens rea* of an offense." *Id*. The *Ruan I* court held that the proposed testimony would not have tended to negate the *mens rea* element of the drug offenses because the Government never alleged that the doctors' treatment of this particular witness was outside the usual

course of professional practice. *Id.* ("[N]othing [the witness] would have testified about would have been probative of Couch's actions towards the patients that the government asserted were provided with illegal prescriptions . . . ."). The same logic applies here. Whether Dr. Murphy practiced good medicine sometimes would not show that at other times he unlawfully prescribed opioids and committed health care fraud offenses.

The fourth category of *Hurn* evidence is that which "'complete[s] the picture' of the charged crimes and presents the government's evidence in a more favorable or different light that might influence a reasonable juror." *Ruan I*, 966 F.3d at 1156 (quoting *Hurn*, 368 F.3d at 1367). This circumstance "recognizes that defendants have a right to combat 'the government's selective presentation of entirely truthful evidence [that] cast[s] a defendant in an inaccurate, unfavorable light' or that makes 'entirely legitimate, normal, or accepted acts appear unusual or suspicious.'" *Id.* (quoting *Hurn*, 368 F.3d at 1366–67). As the doctors did in *Ruan I*, Dr. Murphy argues that "good care" evidence would have completed the picture by counteracting the Government's negative portrayal of his practice. The Eleventh Circuit in *Ruan I* rejected that argument, holding that the proposed testimony was not necessary to complete the picture "because it was undisputed that the [doctors]

14

treated thousands of patients and there was no allegation that they mistreated them all." *Id.* at 1157. The Eleventh Circuit quoted portions of the government's opening and closing statements in which it emphasized that the doctors were not accused of mistreating every single patient: "There is no question . . . that there were certainly instances where Dr. Ruan and Dr. Couch did a really good job for their patients. We're not here because of that. We're here for the times that they were prescribing these drugs outside the usual course of professional practice." *Id.*

As Dr. Murphy admits, the Government described this case similarly. In opening, the Government told the jury, "this case is not about every single prescription that Dr. Murphy wrote over the years or whether Dr. Murphy ever wrote any legitimate prescriptions ever." (Trial Transcript Vol. I at 18.) In closing, the Government stated: "Dr. Murphy did spend time with some patients. He did see patients on first visits. . . . And this case isn't about the times that Dr. Murphy may have provided good care to his patients. This is about the times he didn't." (*Id.* at Vol. IX at 13.)

Additionally, many witnesses, including patients, testified about aspects of legitimate care in the practice. Patient M.A. testified that he saw Dr. Murphy every month and that, without chronic pain treatment, he would not have been able to

15

work; patient D.G. testified about seeing Dr. Murphy monthly and having his medications reduced, and said that the pain medications improved his quality of life; and nurse practitioner Stacey Thiot testified that Dr. Murphy "[a]bsolutely" cared about his patients, stating that he treated his patients well, that pre-signing prescriptions could be characterized as an efficiency, and that she thought Dr. Murphy did a good job. Finally, the jury's acquittal of Dr. Murphy on two substantive counts of dispensing a prescription unlawfully indicates their understanding that the Government did not allege that all of the prescriptions that Dr. Murphy wrote were illegal. Dr. Murphy cannot show that "good care" evidence should have been admitted under the fourth category of *Hurn* evidence.

After the Supreme Court decided *Ruan*, Dr. Murphy added the argument in his supplemental motion for a new trial or acquittal that "good care" evidence also falls into the first *Hurn* category because it bears directly on an element of a charged offense, specifically, his intent to act without authorization in issuing prescriptions. *See Ruan I*, 966 F.3d at 1155 (the first *Hurn* category is "implicated when evidence is excluded that directly pertains to a formal element of a charged offense") (citing *Hurn*, 368 F.3d at 1363). Dr. Murphy argues that before the Supreme Court's decision in *Ruan*, it was arguably appropriate for a court to exclude "good care"

16

evidence as irrelevant, but that after *Ruan*, evidence of good care in other instances should be admissible to disprove that substandard care in some instances was *intentionally* substandard, as opposed to negligently so. *See* Doc. 202 at 36 ("Evidence that a physician provided bad care in ten out of ten cases supports an inference of intentional wrongdoing. Evidence that he provided good care in twenty out of thirty cases rebuts that inference and supports alternative inferences of noncriminal negligence.").

The Court does not find merit to Dr. Murphy's argument that *Ruan*'s holding concerning the *mens rea* for a 21 U.S.C. § 841 charge somehow disregards settled law that "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (citing *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990), where "[t]he fact that Marrero did not overcharge in every instance in which she had an opportunity to do so [was] not relevant to whether she, in fact, overcharged as alleged in the indictment."). In a bank fraud case where intent is at issue, a defendant may not present evidence of all the financial institutions he dealt with and did *not* defraud. So too here, a doctor is not entitled to present evidence of all the patients he dealt with and did not prescribe illicitly to, just

because the Government has alleged that in other instances he did know he was prescribing unlawfully.

In sum, the Court's exclusion of Dr. Murphy's "good care" evidence did not violate his constitutional right to present a complete defense. Finding no constitutional violation, the Court need not determine whether the error was harmless beyond a reasonable doubt.

**D.   Dr. and Jennifer Murphy's arguments that they are entitled to a judgment of acquittal or a new trial on all of the remaining counts based upon insufficiency of the evidence**

**1.   Dr. Murphy's convictions**

***i.   Count 1: drug conspiracy***

Dr. Murphy claims that he is entitled to a judgment of acquittal on Count 1 based upon insufficiency of the evidence, especially after *Ruan*. He argues that the Government presented "no direct evidence of Dr. Murphy's state of mind regarding his prescription writing." But as the Supreme Court recognized in *Ruan*, "the Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence." 142 S. Ct. at 2382. There was an abundance of such circumstantial evidence presented, including through witnesses who testified about Dr. Murphy's frequent absences from the clinics and the staff's handing out of drug

prescriptions to patients, and medical experts who testified about how egregious Dr. Murphy's prescribing practices were.

Additionally, Dr. Murphy testified. He admitted to the jury that he had been a doctor for decades and kept up with the rules; that nurses would see patients and hand out drug prescriptions when he was at another clinic location or out of town; that he could have but declined to hire another doctor; that he pre-signed narcotics prescriptions based on old information; that he pre-signed a drug prescription for one patient for August 2015 that the patient did not receive because he died in July 2015; that he himself described his pre-signed prescriptions as a "standing order;" that patients went "months" if not years without seeing him; and that he made a "substantial income from the clinic."

The jury also heard Dr. Murphy make inconsistent statements. For example, after testifying that he was paid to "supervise" the nerve conduction tests, Dr. Murphy admitted on cross-examination that he was not in the room or even in the clinic for those tests, he did not interpret the test results, and he did not sign the superbills. (Trial Transcript Vol. VIII at 51.) Similarly, after testifying that he never told the Government that "I am motivated to order tests to be paid," Dr. Murphy was forced to admit that this was false, as the transcript of his interview with the

19

Government reflected that he said that he was "motivated to administer the tests to every patient because of payment": "I'm going to say yes because I do like to be paid for services." (*Id.* at 52-53.) The jury was entitled to consider such instances of Dr. Murphy being discredited into account in determining his state of mind. "[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995). In other words, "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *Id.* (internal quotation marks omitted). Thus, Dr. Murphy's own testimony provided additional evidence of his guilt on Count 1.

### ii.    *remaining counts*

Dr. Murphy also challenges all of his remaining convictions: Count 5: conspiracy to commit health care fraud; Counts 6-10: substantive health care fraud; Count 11: conspiracy to defraud the United States and receive or solicit kickbacks; and Count 22: receiving a kickback from QBR, LLC, the company that performed nerve conduction testing on patients at the clinic. As to all of these, he argues that no rational juror could have found that he acted without good faith.

20

Indeed, "[g]ood faith is a complete defense to the element of intent to defraud." *United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir. 1984). Dr. Murphy testified at trial, often stating his belief that various practices he engaged in were legitimate. However, his testimony conflicted with abundant evidence at trial, including documents and other witness testimony. This evidence showed that he defrauded the Government by ordering medically unnecessary urine tests, prescribed medically unnecessary back braces and creams in exchange for kickbacks, and billed for services provided by nurse practitioners under his NPI, among other things. The jury was entitled to evaluate Dr. Murphy's testimony, consider his demeanor and credibility, and even believe the opposite of what he said. In this case, his testimony provided additional substantive evidence of his involvement in fraudulent practices. In sum, there is no merit to the claim that substantial evidence did not support any of Dr. Murphy's convictions.

### 2. Jennifer Murphy's convictions

#### i. *Count 1: drug conspiracy*

Jennifer Murphy similarly argues that the evidence was insufficient to convict her of participating in the drug conspiracy in Count 1. At trial, the Government presented far more than, as Jennifer Murphy argues in her motion, that she was

married to Dr. Murphy and that she was the office administrator. Indeed, the Government presented evidence that Jennifer Murphy played a critical role. Witnesses testified that Jennifer Murphy handled the patients and ran the office, that she brought home stacks of pre-printed prescriptions so Dr. Murphy could pre-sign them and then brought them back to the office so they could be handed out without Dr. Murphy's being there; and that she trumped medical staff decisions so that patients would keep coming, and thus keep getting their opioid prescriptions. Nurse practitioner Stacy Thiot said that she would go to either Dr. Murphy or Jennifer Murphy with questions about patients, because talking to one was like talking to the other. Sales representative Brian Bowman said that he talked to Jennifer Murphy about the concerning patient volume even before 2012. On the strength of this and other trial evidence, it was reasonable for the jury to infer that Jennifer Murphy and Dr. Murphy conspired to unlawfully dispense drugs through prescriptions at their medical practice.[3]

### ii.    *Counts 5-10: health care fraud conspiracy and substantive health care fraud*

---

[3]    Jennifer Murphy also makes a generalized objection to the jury instruction for Count 1 but merely states that she "relies on the arguments made at trial and any arguments that may be raised separately by Dr. Murphy." (Doc. 180 at 20-21.) This objection fails for the reasons given at trial, and Dr. Murphy did not make any arguments as to Count 1's jury instructions.

There was also sufficient evidence of Jennifer Murphy's participation in the health care fraud conspiracy and in support of the substantive health care fraud counts charged in Counts 5-10. The jury heard evidence that the Murphys billed insurance programs for doctor visits even when Dr. Murphy did not conduct them and had a standing order for urine drug screens and nerve conduction studies on patients, including allowing employee urine collectors try to sell patients braces and creams whether they were needed or not.

Jennifer Murphy again claims that the only evidence the government offered in support of her participation in the health care fraud conspiracy was that she was married to Dr. Murphy and ran the clinic. In contrast, the jury reasonably inferred that Jennifer Murphy was a key participant in the health care fraud conspiracy through abundant evidence, including: on insurance documents, she was listed as the billing contact for the practice; sales representative Brian Bowman described talking with her about billing for office visits; several witnesses described her involvement in the braces and creams side of the scheme; sales representative Don Alan Hankins said that she decided how much commission the urine collectors would receive; witness Ruth Ann Rubbo said that Jennifer Murphy would withhold brace and cream money from urine collectors if she was angry at them for something; and Bowman

23

and Hankins would provide Jennifer Murphy with pain cream prescription forms that the urine collectors should use. There was also evidence that Jennifer Murphy signed standing orders for drug screens, even though Bowman emailed her the rules against standing orders early on, and that she, along with Dr. Murphy and on his behalf, took money from QBR for the nerve conduction tests he ordered for every patient twice a year. The jury also saw a video, shot inside the Decatur clinic, depicting Jennifer Murphy in conversation with QBR employees about those payments.

With regard to the substantive health care fraud counts, Jennifer Murphy argues that the Government failed to present evidence of her personal involvement in Dr. Murphy's brace orders and cream prescriptions. However, the jury was instructed on aiding and abetting and *Pinkerton* liability. "*Pinkerton* liability attaches notwithstanding a defendant's non-participation in the offense or lack of knowledge thereof if the substantive offenses were a reasonably foreseeable consequence of the conspiracy." *United States v. Shabazz*, 887 F.3d 1204, 1221 (11th Cir. 2018) (cleaned up). Jennifer Murphy was liable for the substantive health care fraud charges—brace

orders and cream prescriptions generated as part of the conspiracy—because those orders and prescriptions, and numerous others, were a reasonably foreseeable consequence of the conspiracy Jennifer Murphy joined.

### iii.    *Counts 11 and 22: kickback conspiracy and taking a kickback*

There was also sufficient evidence to convict Jennifer Murphy of joining a kickback conspiracy as charged in Count 11, and of taking a kickback from QBR as charged in Count 22. The jury heard evidence about a range of kickbacks, including Bowman's payments to two relatives of Jennifer Murphy (Willie Frank Murphy and Mark Murphy, Jr.); Bowman's and Hankins' and others' donations to Jennifer Murphy's nonprofit, the Crystal Murphy Enrichment Organization ("CMEO"); the free labor Jennifer Murphy received from urine collectors on other companies' payrolls; and the checks from QBR. The jury heard evidence that Jennifer Murphy solicited kickbacks and that others paid those kickbacks. The jury also heard evidence that Jennifer Murphy tried to get Hankins to hide that fact, by drafting a letter stating—falsely—that she had never pressured him to donate to her nonprofit.

Jennifer Murphy argues for acquittal on the substantive kickback count—a $14,000 check from QBR—on the theory that the check was made out to Dr. Murphy, not her. However, the evidence was that she was the conspirator who

25

regularly sought payment from QBR, regardless of who the checks were made out to, and she was the conspirator who regularly received the checks from QBR employees or from Sharon Luttrell acting as courier. Finally, she was liable under *Pinkerton* and as an aider and abettor.

### iv.    Counts 23-25: tax fraud

There was also sufficient evidence to support Jennifer Murphy's convictions on Counts 23-25, which charged her with knowingly making a false, material statement in the Murphys' jointly filed tax returns in violation of 26 U.S.C. § 7206(l). More specifically, these counts alleged falsehoods in line 17 of the Murphys' personal income tax returns for the 2013, 2014, and 2015 tax years—the line on which the Murphys reported income from the clinic in which they were both partners. The evidence showed that those income figures should have been materially higher, but that they were not because Jennifer Murphy intentionally diverted cash from the clinic coffers—to her nonprofit's account and to her personal accounts—where it would not be included in clinic income or subject to tax. Jennifer Murphy also directed kickback payments from sales representatives into the nonprofit's account—rather than into the clinic's business account—where it would not be included in clinic income or subject to tax.

In order to sustain a conviction for this charge, the Government had to prove that: (1) Jennifer Murphy made or caused to be made a tax return for the tax year charged; (2) the tax return for that year contained a written declaration that it was made under the penalties of perjury; (3) when Jennifer Murphy made or helped to make the tax return, she knew it contained false, material information; (4) when Jennifer Murphy did so, she intended to do something she knew violated the law; and (5) the false matter in the tax return related to a material statement. Jennifer Murphy argues that she is entitled to a judgment of acquittal because the evidence did not support each of these elements. Her arguments fail.

The first element is that Jennifer Murphy made or caused to be made a tax return. Jennifer Murphy argues that the Government did not present sufficient evidence of this because no witness testified that she made these tax returns and that instead, the tax returns could have been filled out by the Murphys' tax preparer, Williard Tapscott, without input or oversight from Jennifer Murphy, or that they could have been prepared based off of information wholly provided by Dr. Murphy, not Jennifer Murphy.

However, there was sufficient evidence for the jury to find that Jennifer Murphy made the tax returns at issue. The tax returns were in evidence; IRS Special

Agent Torain testified that they were filed with the IRS; they were electronically signed by both Dr. Murphy and Jennifer Murphy; and also in evidence were copies of those tax returns with a "1B" Bates stamp at the bottom, which an FBI evidence custodian explained meant they were taken from the Murphys' clinic. Those tax returns from the Murphys' clinic also included electronic authorization forms by Jennifer Murphy, evidence that Jennifer Murphy authorized her electronic signature as it appeared on the documents filed with the IRS.

The second element is that the returns were made under penalty of perjury. Jennifer Murphy argues that the Government presented no evidence that she actually signed the tax returns, noting that the returns contained asterisks indicating that they were signed electronically and that Agent Torain acknowledged that such electronic signatures can be created by a tax preparer. However, sufficient evidence was presented that she electronically signed under penalty of perjury, considering that the tax returns themselves contain that avowal.

The third element is that Jennifer Murphy knew the tax returns contained false information. Jennifer Murphy argues that the Government did not reasonably prove what the clinic's income was for the years in question, that it was inaccurately recorded, or that she knew about it. The evidence refutes these claims. Agent Torain

testified about line 17 of the Murphys' tax returns for the relevant years, explaining that partnerships reported partnership income on Forms 1065, and that income flowed through to the personal tax returns of the partners, where it would be reportable income subject to income tax. He explained that, if the partnership income was understated, line 17 of the partners' tax returns would also be understated. He explained that income to nonprofits would not be subject to tax— those organizations filed Forms 990 but their income was non-taxable. Agent Torain confirmed that, in addition to the Murphys' personal joint tax returns for 2013, 2014, and 2015, the CMEO's Forms 990 and the clinic's partnership tax returns had been filed with the IRS for those years. Agent Torain also described the evidence that the clinic's partnership income, and thus line 17 of the Murphys' tax returns, was materially understated. He explained that, as part of the investigation, records were subpoenaed for accounts associated with Dr. Murphy and Jennifer Murphy and the clinic; that those records were reviewed by agents, including himself; that the bank records for the clinic bank accounts would show income to the clinic; that he had also reviewed the records of and prepared summary charts for the CMEO account and Jennifer Murphy's personal bank accounts; and that these other accounts reflected significant additional influxes of cash during 2013, 2014, and 2015. Agent

Torain testified that these additional amounts of cash were material, and that they added up to approximately $750,000 more in income for 2013, 2014, and 2015 than the clinic bank account records reflected.

Other evidence at trial corroborated the documentary evidence that large sums of clinic cash were not deposited into the clinic bank account and were not reflected in the amount of clinic income reported in its partnership tax returns—and correspondingly line 17 of the Murphys' personal tax returns—for the relevant tax years. The jury heard that Jennifer Murphy handled copays at the front desk, and that she would sometimes put cash in her purse. Ruth Ann Rubbo testified about the garbage bag of cash in Jennifer Murphy's bathroom. Sharon Luttrell testified that Jennifer Murphy gave her cash and asked her to buy CMEO cashier's checks for Jennifer Murphy. The bank records for the CMEO account and Jennifer Murphy's personal accounts showed large cash deposits consistent with this testimony, from which the jury was free to infer that Jennifer Murphy had diverted cash from the clinic's accounts to her own.

The evidence was likewise sufficient that Jennifer Murphy knew the clinic income as reported on line 17 of her income tax returns was understated. The jury reasonably made this inference from the evidence that she took cash from the clinic,

told others to convert clinic cash into cashier's checks payable to a nonprofit that would not be taxed, and solicited payments, i.e., kickbacks, from sales representatives, pharmacists, and nerve conduction testing vendors in the form of CMEO "donations."

The fourth element is that Jennifer Murphy intended to do something she knew violated the law. There was substantial evidence of this, including in the form of evidence that Jennifer Murphy concealed how she took money from the clinic. She gave Keith Turner and Sharon Luttrell cash to buy cashier's checks for her, made payable to the CMEO. The jury was entitled to draw the reasonable inference that Jennifer Murphy used cashier's checks and cash deposits to conceal the taxable nature of the cash—to reframe taxable clinic proceeds as nontaxable charitable gifts. That inference received further support from Sharon Luttrell's testimony that Jennifer Murphy gave her specific instructions to lie about the source of the cash for the cashier's checks Luttrell bought for her. Sharon Luttrell testified that on multiple occasions Jennifer Murphy gave her cash, told her to use it to buy certified cashier's checks made out to the CMEO, and bring it back to her. Jennifer Murphy then told Luttrell that, if she was ever asked about the checks, Luttrell should "just say it's

[my] money, it's not going to hurt anything. And you can take it off your income taxes, as a donation."

The fifth element is that the false matter in the tax return related to a material statement. As Agent Torain testified, there was a "material" discrepancy between (1) clinic income as reflected in the clinic bank account records and the Murphys' income tax returns, and (2) clinic income considering the large cash deposits into Jennifer Murphy's personal accounts and the CMEO account. The jury reasonably concluded that a $750,000 discrepancy in the Murphys' reported taxable income was material. The evidence therefore supported the jury's verdict on Counts 23-25.

### E. Jennifer Murphy's argument that she is entitled to a new trial on all counts based on the "prejudicial spillover" from her conviction on Count 1

Jennifer Murphy argues that a new trial is required on all of the remaining counts—the non-controlled substances offenses—because all of her convictions were obtained as a result of "prejudicial spillover" from Count 1.[4]  The case relied upon by Jennifer Murphy, *United States v. Prosperi*, 201 F.3d 1335 (11th Cir. 2000), shows that prejudicial spillover only applies in cases where some counts are dismissed after trial, and the court must decide whether a new trial is needed on the

---

4      Dr. Murphy joins in this argument.

remaining counts. *Id.* at 1345 (explaining that the court "must consider whether the convictions were the result of prejudicial spillover: that is, was there evidence (1) that would not have been admitted but for the dismissed charges and (2) that was improperly relied on by the jury in their consideration of the remaining charges"). Indeed, if some counts are dismissed, there is a possibility that the jury heard evidence that, without those counts, it would not have heard. Here, her argument fails because it is premised upon the assumption that this Court will vacate her conviction on Count 1, the drug conspiracy conviction, based upon *Ruan*. However, as discussed above, since no error occurred with regard to Count 1 and it is not due to be vacated, no new trial could possibly be required for other counts due to any evidence heard by the jury on Count 1.

**F.    Jennifer Murphy's argument that the Court erroneously denied her motion for a mistrial after Government witness Willard Tapscott invoked his right to remain silent after testifying**

The Court now turns to Jennifer Murphy's argument that she deserves a new trial due to the Court's denial of her mistrial motion based upon the trial testimony of Government witness Willard Tapscott, the Murphys' long-time tax preparer.

The Government called Mr. Tapscott to testify about his preparation of the Murphys' tax returns. (Trial Transcript Vol. VI at 190-200 (direct examination).)

Early into his testimony, the Court determined that he should have counsel appointed to ensure that he was aware of any incriminating implications of his testimony. (*Id.* at 200-08.) Before he was stopped by this Court, Mr. Tapscott had testified that he has been the Murphys' friend and accountant for approximately 20 years, that he also worked as a bookkeeper for the clinic, that he prepared personal tax returns for the Murphys, including for the clinic and for CMEO, that members of his family served as officers of CMEO, and that Jennifer Murphy maintained the records for CMEO and "controlled" CMEO. He recounted that he once purchased a $7,500 cashier's check payable to CMEO with a paper bag of cash provided by Jennifer Murphy. He also stated that he prepared a Form 990 for the year 2014 for the CMEO using information provided by Jennifer Murphy.

During the sidebar with the lawyers after the Court stopped him from testifying, the Government stated that Mr. Tapscott did not have a lawyer, that he had not been warned about the possibility of making incriminating statements, but that, in their view, Mr. Tapscott bore no culpability related to the drug conspiracy charged in this case. The Government further stated that they expected Mr. Tapscott to testify that he prepared the 2013, 2014, and 2015 tax returns for the clinic based off of information that he received from the Murphys, but that, in 2018, after

34

the Government's investigation became known, he filed amendments to the returns, assessing it with additional income after learning that Jennifer Murphy had diverted cash from the clinic into the CMEO and other bank accounts. *Id.* at 201-02.

Mr. Tapscott was excused from the stand, the trial continued, and the next morning a lawyer was appointed for Mr. Tapscott. The lawyer informed the Court and the parties that Mr. Tapscott would assert his Fifth Amendment right not to answer questions. Jennifer Murphy's counsel orally asked for a mistrial based on Mr. Tapscott's testimony, but the Court declined to grant a mistrial. The Court excused Mr. Tapscott from the trial, stated that it would direct the jury to disregard his testimony, and directed the Government not to argue in its closing argument about the cashier's check Mr. Tapscott bought. When the jury was brought back in, the Court gave the following instruction:

> Yesterday we had a witness testify by the name of Willard Tapscott, he was the individual that said he did accounting work. You are instructed that you need to disregard and shall disregard all of his testimony. Okay? So, you will not use anything that he said for any reason. Just like it didn't happen. Anybody not able to disregard his testimony? Raise your hand. Let the record reflect all of them indicated they will disregard the testimony.

(Trial Transcript Vol. VII at 31-32.) The Court reiterated that instruction later the same day:

Ladies and gentlemen, you all had a question about who was the individual that I told you to disregard his testimony. His name was Willard Tapscott, he's about seventy odd years old, white guy, retired from the post office, and then talked about whatever and then he testified. Okay. That's who I'm talking about. Everybody understand who I'm saying? We're going to go ahead and call your first witness.

(*Id.* at 96.)

Jennifer Murphy again argues that a mistrial is warranted, on at least the three tax fraud counts (Counts 23-25). In support, she focuses on Mr. Tapscott's statement that he prepared Forms 990 for the CMEO using documents that she provided. Her theory is that Mr. Tapscott's testimony that she was directly involved in his preparation of the CMEO's tax filings suggested to the jury that she would have also been directly involved in his preparation of the Murphys' personal tax returns, including for the clinic in 2013, 2014, and 2015, the years in which it was alleged that they underrepresented their income. She argues that this would have been the only evidence linking her to the substantive tax fraud charges. Jennifer Murphy complains that she was not able to cross examine Mr. Tapscott and that, although the Court issued a limiting instruction to the jury, the damage had already been done.

The trial court has discretion whether to grant a mistrial because it "is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002) (cleaned up). "When a district court gives a curative instruction, the reviewing court reverses only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *Id.* (cleaned up). Such a level of prejudice effect exists where there is "a significant probability . . . that . . . the stricken statement had a substantial impact upon the verdict of the jury." *United States v. Arenas-Granada*, 487 F.2d 858, 859 (5th Cir. 1973).

"Generally, it is improper for either the government or the defense to call a witness for the purpose of having the witness invoke the Fifth Amendment privilege." *United States v. Feliciano-Francisco*, 701 F. App'x 808, 813 (11th Cir. 2017). "Such testimony has 'dubious probative value and high potential for prejudice,' and the district court has discretion to exclude it." *Id.* at 813-14 (quoting *United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974)). Although the Court struck the testimony of Mr. Tapscott, the Court is convinced that Jennifer Murphy suffered no prejudice from Mr. Tapscott's brief direct testimony. The testimony was not harmful to Jennifer Murphy, and even if it was, the Court's limiting instructions

37

cured any error. The testimony was not harmful because the CMEO's Forms 990 were not the subject of the three tax fraud charges in this case. In any event, there was ample other evidence of Jennifer Murphy's guilt on the three tax fraud charges independent of Mr. Tapscott's testimony, as discussed above in section III.D.2.iv. Indeed, the two documents that were shown to Mr. Tapscott were already in evidence. Further, there is a well-recognized presumption that "juries follow the instructions they are given." *United States v. Townsend*, 630 F.3d 1003, 1014 (11th Cir. 2011). The Court sees no error in the handling of this issue.

## G.   Jennifer Murphy's argument that the cumulative effect of the individual errors in this case warrants a new trial

Finally, the Court addresses Jennifer Murphy's argument that she is entitled to a new trial based upon the cumulative effect of this Court's errors. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013) (cleaned up). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." *Id.* (cleaned up). Jennifer Murphy has not identified any errors here that would

warrant the application of this doctrine. She also has "failed to demonstrate, or offer any explanation, for how the aggregate effect of [any] errors substantially influenced the outcome of [her] trial, as required to establish that cumulative error rendered [her] trial unfair." *Id*. Her cumulative-error claim therefore fails.

## IV.   Conclusion

For the reasons stated in this opinion, the following rulings are hereby made:

1)   Jennifer Murphy's motion for new trial and acquittal (doc. 180) is **DENIED**;

2)   Dr. Murphy's motion for new trial (doc. 181) is **DENIED**;

3)   Jennifer Murphy's supplemental motion (doc. 201) is **DENIED**;[5]

4)   Dr. Murphy's supplemental motion (doc. 202) is **GRANTED IN PART and DENIED IN PART**. Insofar as the motion requests that Dr. Murphy's conviction on Count 3 be vacated, the motion is **GRANTED**. Insofar as Mark Murphy requests all other relief, the motion is **DENIED**.

Defendant Mark Murphy's conviction on Count 3 is hereby **VACATED** and this cause shall proceed to sentencing.

---

[5]       Jennifer Murphy also filed a "Renewed Motion for Judgment of Acquittal and Supplemental Motion for New Trial; or, Alternatively, Motion for Leave to File Same; and Motion to Set Briefing Schedule," (doc. 193) that the Court granted insofar as she requested leave to file a supplemental brief. To the extent that the motion requests substantive relief, it is **DENIED**.

**DONE** and **ORDERED** on February 17, 2023.

_____
L. Scott Coogler
United States District Judge

160704